Filed 2/18/15  P. v. Fernandez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038618 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1138192) |
| v. | |
| JOSE MANUEL FERNANDEZ, | |
| Defendant and Appellant. | |

A jury found defendant Jose Manuel Fernandez guilty of four counts of committing lewd or lascivious acts on a child (Pen. Code, § 288, subd. (a))[1] and seven counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 288, subd. (b)(1)).  Defendant contends the trial court erred by not giving CALCRIM No. 121 or a substantially equivalent instruction regarding evidence in a foreign language.  Defendant also claims there was insufficient evidence to support certain counts and, alternatively, that his sentence violates section 654.  For the reasons stated here, we will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

The following is taken from evidence adduced at defendant's jury trial.

Defendant's stepdaughter, B. Doe (Doe), lived with him, her mother, and Doe's four

---

[1]  Unspecified statutory references are to the Penal Code.

siblings in Gilroy. At the time of defendant's arrest in April 2011, defendant was 26 and Doe was 11 and finishing sixth grade.[2]

According to Doe's friend Desiree, in fourth grade Doe came to school with three hickeys on her neck and told Desiree that defendant gave them to her. Two years later, in early 2011, Doe reportedly informed Desiree in the school locker room that defendant would sexually touch Doe. Specifically, Doe told Desiree that defendant would touch Doe's "boobs" and vagina, and would grab her hand and put it on his penis.

On April 18, 2011, one of Doe's brothers mentioned to a social worker at school that defendant was allegedly having sex with Doe. The next day a social worker contacted Doe at school and Doe disclosed that defendant had molested her. The social worker then contacted the police, who took Doe to a police station in Gilroy for an interview.

Before the police interviewed Doe on April 19, they convinced her to participate in a "pretext call," described by police detective Jason Smith as a monitored and recorded phone call between the victim and a suspect where the police provide guidance regarding questions to ask. The pretext call between Doe and defendant was in Spanish.[3] Doe stated in the call that she told a friend defendant was touching her. When Doe mentioned possibly telling her mother, defendant said "[n]o, honey ... you guys will get me in trouble" and told her "they can put me in jail." Defendant promised that "I'm not going to touch you anymore or anything" and asked her to tell her friend that she was lying or else the friend was going to "get me in trouble, and then who's going to take care of everybody?"

_____

[2] To protect the anonymity of the victim and other minors in this case, and meaning no disrespect, we will refer to certain individuals by their first names only.

[3] Although they were marked as evidence but never admitted, we rely on the English language translations of the pretext call and defendant's interrogation. We will discuss defendant's contentions related to the trial court's jury instructions on this point.

Detective Smith then interviewed Doe in English. Doe said defendant never touched her chest sexually but that when they were together in the family's house he would try to kiss her, touch her "private part," and grab her hand and make her "do stuff" to his penis. Doe told the detective she did not want to "touch it" and "always tried like to pull away ... ." Doe said she touched his penis three to four times and that he touched her private part four or five times. When asked when this would happen, Doe responded, "[l]ike at th[e] same time when he like, do all that other stuff." Doe explained that defendant would "just like start[] hugging me ... and then that's when he starts doing all the rest." Later she said "he would hold me and then he would like start doing himself too, he would, like, yeah." Doe indicated that the first incident of sexual touching occurred in second grade. The most recent incident had happened the previous month, when defendant pulled Doe's hair to make her stand up from her bed and then made her "get on top of him" as he lay on the couch. Regarding the frequency of sexual touching, Detective Smith asked her if it happened "[o]nce a month, once a year?," and Doe ambiguously responded "[y]eah, once, once or twice."

During Doe's interview, defendant arrived at the police station and was detained. Defendant was given a *Miranda* advisement (*Miranda v. Arizona* (1966) 384 U.S. 436) and was interrogated by Detective Smith and Officer Jesus Cortez, who acted both as a Spanish translator and as an interrogator. When asked about his interactions with Doe, defendant said he would sometimes hug her but that he did not "do it with bad intentions." Later defendant admitted touching Doe's "butt" on one occasion and that he might have also accidentally touched her vagina. After further questioning, defendant eventually said Doe touched his penis approximately three times over his pants and twice skin-to-skin. Defendant described that he would take her hand and place it on his penis. He recalled that one such incident occurred in approximately February 2011.

Defendant also admitted touching Doe's vagina both over her clothes and skin-to-skin but said it "wasn't more than three times." Defendant recalled an incident in

3

December 2010 when he touched Doe's vagina outside her clothes for three or four seconds and rubbed up and down. He recounted another incident in January 2011 where he touched Doe's vagina over her clothes in her bedroom. A third touching over clothing occurred one night in the living room while they were standing. Defendant said that he touched Doe's vagina at least one time skin-to-skin while they were standing in his bedroom.

At the end of the interrogation, Detective Smith told defendant that he would give him the opportunity to write Doe an apology letter. Defendant drafted two handwritten letters in Spanish, one to the mother and one to Doe. In the letter to Doe, he asked her to "forgive me for the bad that I was doing to you" and promised "it will never happen again."[4] In the letter to the mother, defendant said he "made a mistake with what I did with [Doe] but it never went through my mind to do anything to her," and promised the mother "[n]ever again will it happen again." Defendant was taken into custody after the interrogation.

On April 20, Detective Smith and Detective Wes Stanford interviewed Doe's mother about her daughter's accusations. The mother did not mention the possibility of Doe recanting and also said nothing about Doe's propensity to make up stories. Doe's mother asked if they could drop the charges against defendant and expressed concern about her ability to pay bills without defendant in the home. The detectives offered to let the mother watch the recordings of Doe's interview and defendant's interrogation but she chose not to. The People filed a felony complaint against defendant the same day alleging one count of committing lewd or lascivious acts on a child (§ 288, subd. (a)).

In May 2011, Doe attended an overnight science camp with her friends Desiree and Daisy. Daisy recalled Doe talking at night in the cabin where the girls were staying about "getting raped" by defendant and that this conduct had been going on since the

---

[4] We rely on the English language translations of the letters that were admitted into evidence at trial.

third or fourth grade. Daisy said Doe mentioned defendant "[g]rabbing her real hard and making her do stuff," and touching Doe's vagina "all the time when her mom would leave to go to her work, which was face painting." According to Desiree, Doe told the girls that when her mother would leave defendant at home with Doe he would touch her sexually, consistent with Doe's statements to Desiree in early 2011 in the locker room.

Following a preliminary hearing, the People charged defendant by felony information with four counts of committing lewd or lascivious acts on a child (§ 288, subd. (a)) and seven counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 288, subd. (b)(1)). Count seven specified a date "on or around March 14, 2011" for its section 288, subdivision (b)(1) allegation, while the other ten counts provided a date range between September 1, 2006 and April 18, 2011.

The case proceeded to trial in early 2012. During voir dire, the court mentioned to some of the potential jurors that in the event testimony is given in another language "[y]ou must rely on the translation provided by an interpreter even if you understand the language spoken by the witness. Do not retranslate any testimony for other jurors."

Several witnesses testified at trial for the prosecution. Doe recanted her allegations against defendant at trial. She admitted that she reported defendant's alleged actions to the police, Desiree, and Daisy, but maintained that she was lying during each of those disclosures. On cross-examination by defense counsel, Doe confirmed she had also recanted at the preliminary hearing. When asked why she would make up these allegations, Doe claimed that she did so because defendant was too strict and did not allow her to go to parties with her friends. In addition to recounting Doe's disclosures regarding defendant, Desiree testified that Doe's mother approached her during a field trip in November 2011 and told her that the accusations against defendant were untrue.

The prosecution played video recordings of Doe's interview, the pretext call, and defendant's interrogation. The jury was provided with a transcript of each of the

5

recordings. Before playing the recording of Doe's interview, the trial court admonished the jury: "Ladies and gentlemen, you're going to be receiving a copy of the transcript. It is not part of the transcript, that is not part of the evidence in the case. It is being provided to you to assist you in following along with the DVD that is the evidence in the case."

Unlike Doe's interview, the pretext call was in Spanish and the transcript contained a transcription in Spanish as well as a side-by-side translation into English. Gilroy Police Officer Eustaquio Rodriguez, a fluent Spanish speaker, testified that the translation was accurate. Before playing the pretext call recording, the court told the jury: "Ladies and gentlemen, the same admonition I gave you previously, the transcript is not evidence but is to assist you in listening to the tape." According to the prosecutor, defense counsel received a copy of the pretext call transcript "previously."

Like the pretext call transcript, the transcript of defendant's interrogation (which took place in English and Spanish) included both the Spanish transcription and an English translation. Officer Cortez, who assisted in the interrogation, testified to the accuracy of the translation. Before it was played the court informed the jury: "The same admonition, ladies and gentlemen." The transcripts were collected from the jury after the recordings were played and, although marked as exhibits, were never admitted as evidence.

Defense witnesses included Doe's mother, who testified that Doe had a tendency to make up stories and that Doe had recanted her allegations against defendant during a walk with her on the evening of April 19. The mother also said she never saw any hickeys on Doe's neck and that it was "very rare" for defendant to be home alone with the children. She stated neither she nor Doe ever received an apology letter from defendant. Two of defendant's relatives testified to defendant's good character.

Defendant also testified. He stated that he had a second grade education. He claimed he was referring to an innocent, non-sexual interaction with Doe during the

6

pretext call. Regarding the interrogation, defendant maintained that the officers had told him that if he was unsure of an answer he "should say yes." He admitted pulling Doe's hair to get her out of bed in March 2011. When confronted on cross-examination with his statements during the interrogation, defendant confirmed he made the statements attributed to him but argued none of those statements was true. Similarly, defendant confirmed he had rubbed his crotch during the interrogation to simulate what he did to Doe but said that he never actually rubbed Doe in that way.

Carl Lewis testified for the prosecution as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS), which he described as a series of conditions and behaviors exhibited by children who are victims of child molestation that might seem unexpected. Lewis stated the behavioral categories predicted by CSAAS are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, or unconvincing disclosure of abuse; and (5) retraction.

At the close of evidence and outside the presence of the jury the court reviewed the proposed jury instructions with counsel. The instructions as proposed and given did not include CALCRIM No. 121, which provides:

> "You (may/are about to) hear a recording [that is partially] in a foreign language. You will receive a transcript with an English language translation of that recording. [¶] You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong. [If the recording is partially in English, the English parts of the recording are the evidence.]"

In explaining the evidence available to the jury, the court informed them that they would have access to the recordings and that they could request the transcripts but "[t]he transcripts, as I remind you, are not in evidence. You may have the transcripts to assist you while you're watching or listening to any of the tapes if you wish; just ask for them and they will be provided and then you will need to give them back." The instructions also included CALCRIM No. 3501, which informed the jury, in relevant part:

7

"The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: 1) you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; or 2) you all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

During deliberations, the jury requested the transcripts of all three recordings and the court provided them after an unreported discussion with counsel. The jury found defendant guilty of all 11 counts and the court sentenced him to a total of 30 years in state prison, finding the counts "warrant separate punishment because they were all separate acts and on separate occasions."

## II.  DISCUSSION

### A.  INSTRUCTIONAL ERROR REGARDING TRANSLATIONS

Defendant argues that the trial court committed reversible error by telling the jury that the Spanish-language recordings of the pretext call and defendant's interrogation were the evidence they were to consider but not the English translations of those recordings. Defendant urges us to follow the reasoning of the now depublished *People v. Arancibia*, previously reported at 213 Cal.App.4th 1465, and find the error to be structural. (*People v. Arancibia* (Feb. 27, 2013, B240341) [opn. ordered nonpub. June 12, 2013, S209794].) Alternatively, defendant argues his trial counsel provided ineffective assistance in failing to request CALCRIM No. 121 or a similar instruction.

When an English language recording is admitted into evidence and played for the jury, the recording itself constitutes the evidence to be considered by the jury and any transcription is considered merely an aid. (See *People v. Brown* (1990) 225 Cal.App.3d 585, 597-599.) However, when a recording is in another language, the proper evidence for the jury to consider is the translation of the recording and not the original non-English version. (See *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303-304 [finding juror misconduct when juror retranslated portions of the defendant's Spanish language

8

testimony rather than relying on the court interpreter's translation].)  CALCRIM No. 121 contains the recommended admonition when a party wishes to play a recording in a foreign language.

Although the trial court properly instructed the jury before it heard Doe's English language interview that the recording rather than the transcript constituted the evidence to be considered, the People concede that the court mistakenly instructed the jury by repeating the same admonition for the Spanish language recordings.  We will determine whether the error affected defendant's substantial rights and would therefore require reversal, despite there being no objection from defendant at trial.  (§ 1259.)

Few errors are reversible per se.  To rise to the level of structural error, it must be one which affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself."  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310.)  The quintessential structural error in the context of jury instructions occurs when an instruction reduces the burden of proof below the Fifth Amendment's requirement that guilt be determined beyond a reasonable doubt.  As the Supreme Court stated in *Sullivan v. Louisiana* (1993) 508 U.S. 275, 281, "where the instructional error consists of a misdescription of the burden of proof, [it] vitiates *all* the jury's findings."  Here, the trial court's instructional error is more akin to an evidentiary rather than structural error, and therefore does not require automatic reversal.

Defendant also asserts the instructional error "deprived [him] of his federal due process rights to a fair trial under the Fourteenth Amendment of the United States Constitution because the verdict was not based upon the unanimous verdict of twelve jurors who heard and saw exactly the same evidence, at the same time."  (Citing *Neder v. United States* (1999) 527 U.S. 1, 8 (*Neder*).)  In *Neder*, the jury instructions omitted an element of the charged offense, which the court found violated the defendant's Sixth Amendment jury trial guarantee.  (*Neder*, at pp. 8, 12.)  Noting that "a 'very limited class of cases' " are subject to automatic reversal, the court rejected the defendant's claim that

9

the error was structural and concluded that the error was reversible unless the prosecution could show it was harmless beyond a reasonable doubt. (*Id.* at pp. 8, 16, citing *Chapman v. California* (1967) 386 U.S. 18.) Unlike the faulty instruction in *Neder*, here defendant does not claim the instructions omitted any element of the charged offenses and he does not affirmatively show how the error otherwise violated any federal constitutional protections. (*Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564 [error must be affirmative shown].)

Article 6, section 13 of the California Constitution states that "[n]o judgment shall be set aside ... on the ground of misdirection of the jury, or of the improper admission or rejection of evidence ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) The California Supreme Court clarified that the miscarriage of justice test "is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149 [finding failure to instruct sua sponte on a lesser included offense subject to *Watson* error analysis], citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

On this record, we see no reasonable probability that defendant would have achieved a more favorable result with a proper jury instruction. The record discloses no evidence that any of the jurors spoke Spanish, much less that any juror retranslated the recordings. The jury's request for the *transcripts* rather than the recordings during deliberation suggests that the jurors based their decision on the English translations provided in the transcripts. Further, Officers Rodriguez and Cortez testified to the accuracy of the translations of the pretext call and defendant's interrogation, respectively, and defense counsel did not lodge any objections related to their accuracy.

Defendant's ineffective assistance of counsel claim is similarly unpersuasive. To prevail, defendant must show his trial counsel's performance was deficient and that he

was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To prove prejudice, defendant must affirmatively show a reasonable probability that, but for his trial counsel's errors, the result would have been different. (*Id.* at pp. 217-218.) However, "[i]f a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150, citing *Strickland v. Washington* (1984) 466 U.S. 668, 697.) Defendant asserts that he would have achieved a more favorable result had defense counsel objected but makes no affirmative showing of prejudice. As we have already discussed, we find no reasonable probability that the result would have been different if defense counsel had informed the court of its error and obtained a proper admonition regarding the transcripts.

## B. SUFFICIENCY OF THE EVIDENCE

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence-that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) We will affirm a conviction if " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 224, original italics.) "The testimony of a single witness is sufficient to uphold a judgment" (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200 (*Sheila B.*)), and "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses." (*People v. Little* (2004) 115 Cal.App.4th 766, 771 (*Little*).)

### 1. Evidence to Support Eleven Section 288 Counts

Defendant argues that there was insufficient evidence to convict defendant of more than six counts of lewd or lascivious conduct due to the generic nature of some of

11

the testimony. He also argues that the proximity between the multiple unlawful acts during each incident precluded more than one conviction per incident.

Section 288, subdivision (a) punishes "any person who willfully and lewdly commits any lewd or lascivious act ... upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child ... ." (§ 288, subd. (a).) Section 288, subdivision (b)(1) enhances the penalty for "[a]ny person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person ... ." (§ 288, subd. (b)(1).)

Generic testimony can support a conviction for a sex offense, particularly in cases involving a young victim and a resident perpetrator. (*People v. Jones* (1990) 51 Cal.3d 294, 299 (*Jones*).) In such cases, the victim "typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults." (*Ibid.*) To support a conviction, generic testimony must, at a minimum, describe: (1) "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct"; (2) "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment"; and (3) "*the general time period* in which these acts occurred ... to assure the acts were committed within the applicable limitation period." (*Id.* at p. 316, original italics.)

The California Supreme Court has consistently rejected the reasoning of defendant's argument that he cannot be convicted for more than one count per incident because Doe testified the touching occurred at the "same time." In *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*), the court determined that "[e]ach individual act that meets the

requirements of section 288 can result in a 'new and separate' statutory violation."
(*Scott*, at pp. 346-347, quoting *People v. Harrison* (1989) 48 Cal.3d 321, 329
(*Harrison*).) The court explained that courts have "long assumed that one offense is
complete and another one begins whenever the perpetrator stops and resumes unlawful
activity during a sexual assault." (*Scott*, at p. 345.) Additionally, when a defendant
commits multiple sexual acts that are different from one another during a single incident,
"they may result in multiple convictions even if committed in rapid succession."
(*Harrison*, at p. 330 [collecting cases].) As noted in *Scott*, a contrary decision would
mean "the clever molester could violate his victim in numerous lewd ways, safe in the
knowledge that he could not be convicted and punished for every act. In light of the
special protection afforded underage victims, we cannot conceive that the Legislature
intended this result." (*Scott*, at p. 347.)

Here, in closing argument the prosecutor explained that counts one through six (§
288, subd. (b)(1) counts) "are charges that we're going to talk about generic testimony
under [CALCRIM No.] 3501." Count seven referred specifically to the hair pulling
incident from March 14, 2011 (which defendant does not challenge on appeal). And
counts eight through eleven (§ 288, subd. (a) counts) included "the hickeys on the neck ...
[a]nd then ... anytime during the course of that when he's coming in there and grabbing
her inappropriately with that sexual interest at any time [from] second grade on." The
prosecutor then paraphrased CALCRIM No. 3501, informing the jury it must not find
defendant guilty unless "[y]ou all agree that the People have proved that the defendant
committed all the acts ... during this time period and have proved that the defendant
committed at least the number of offenses charged."

Reviewing the record in the light most favorable to the judgment, we find
substantial evidence from which a reasonable trier of fact could find the defendant guilty
beyond a reasonable doubt of committing eleven separate lewd or lascivious acts.
(*Lindberg, supra,* 45 Cal.4th at p. 27.) During her interview with Detective Smith, Doe

13

estimated that she touched defendant's penis three to four times and that he touched her private part four or five times. Defendant stated during his interrogation that Doe touched his penis approximately five times and that he touched her vagina three times. The jury was entitled to believe Doe's interview testimony, which accounts for up to nine touching incidents. Despite Doe's ambiguous testimony that the touching happened at the "same time," because defendant's touching of Doe's vagina and her touching of his penis are "of an entirely *different* nature," the jury could treat them as separate acts "even if committed in rapid succession." (*Harrison, supra,* 48 Cal.3d at p. 330, original italics.)

Defendant questions the reliability of Desiree's testimony that Doe came to school with hickeys on her neck in fourth grade and told Desiree that defendant was the cause. But contrary to defendant's interpretation of *People v. Cuevas* (1995) 12 Cal.4th 252, 262-263 (*Cuevas*), it remains the rule that "[t]he testimony of a single witness is sufficient to uphold a judgment" so long as it is supported by substantial evidence. (*Sheila B., supra,* 19 Cal.App.4th at p. 200.) On the issue of whether an out-of-court identification made by a witness who later recanted was sufficient to support a conviction, *Cuevas* disapproved a rule from an older case requiring independent corroboration and held that "the substantial evidence test ... should be used to determine whether an out-of-court identification is sufficient to support a criminal conviction." (*Cuevas,* at p. 272, overruling in part *People v. Gould* (1960) 54 Cal.2d 621, 631.) Applying that standard here, Desiree testified she saw three hickeys on Doe's neck at school one day during fourth grade and that Doe told Desiree, "my step dad gave me a hickey like when I was asleep." The jury could reasonably credit Desiree's testimony about what Doe told her over the contrary testimony by Doe's mother, given Desiree's comparative impartiality and the lack of evidence that she had any motivation to testify falsely. In contrast, Doe's mother acknowledged at trial that she had asked the detectives soon after defendant's arrest if she could not press charges and had also expressed concern to them about not being able to pay bills without defendant's help. The

14

reliability of Desiree's testimony was further enhanced by the fact that she was not merely backing up her friend Doe, but actually contradicting Doe's recanted version of events. A reasonable jury could therefore conclude that Doe was telling the truth in her out-of-court statement to Desiree that defendant gave her hickeys.

The nine acts identified by Doe, the hair pulling incident, and Desiree's testimony regarding hickeys provide substantial evidence to support the 11 separate counts of lewd or lascivious acts.

### 2. Evidence of Force, Violence, Duress, Menace, or Fear of Immediate and Unlawful Bodily Injury (§ 288, subd. (b)(1))

Because of "the harsher penal consequences of a conviction" under section 288, subdivision (b) as opposed to section 288, subdivision (a), "the force used for a subdivision (b) conviction [must] be 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*People v. Soto* (2011) 51 Cal.4th 229, 242 (*Soto*), quoting *People v. Cicero* (1984) 157 Cal.App.3d 465, 474.) Such force "includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005, citing *People v. Babcock* (1993) 14 Cal.App.4th 383, 385 & 388 [finding sufficient evidence of force where the defendant grabbed the victim's hand and placed it on his crotch].) Defendant argues there was an insufficient showing of force or duress to support counts one through six.

During her interview, Doe stated that defendant would grab her hand and make her "do stuff" to his penis and that she "always" tried to pull away. Later, Doe said "he would hold me and then he would like start doing himself too ... ." Consistent with Doe's statements, Daisy testified that Doe told her about defendant "[g]rabbing [Doe] real hard and making her do stuff" and that she thought the conduct started in "third or fourth" grade. From this evidence, the jury could reasonably conclude that on at least seven occasions (including the hair pulling incident) defendant committed a lewd or lascivious

15

act upon or with Doe's body by use of force " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*Soto, supra,* 51 Cal.4th at p. 242.)[5]

## C. SECTION 654

Defendant contends the trial court erred in not staying some of his felony convictions under section 654, which provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).) Like his sufficiency of the evidence argument, defendant claims section 654 bars separate punishment for each count because he touched Doe's vagina at the "same time" that she touched his penis during each incident.

However, "multiple sex acts committed on a single occasion ... are generally 'divisible' from one another under section 654, and separate punishment is usually allowed." (*Scott, supra,* 9 Cal.4th at p. 344, fn. 6.)  "Even where the defendant has but one objective-sexual gratification-section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished." (*Alvarez, supra,* 178 Cal.App.4th at pp. 1006-1007 [finding no § 654 violation where the defendant was separately sentenced for kissing the victim, digitally penetrating her, and forcing her to fondle his penis during the same incident].)  As we have already discussed, each individual act committed by defendant was a separate offense "even if committed in rapid succession." (*Harrison, supra,* 48 Cal.3d at p. 330.)  Because these separate offenses are

---

[5]  Defendant devotes a large portion of his opening brief to discussing *Soto's* disapproval of a line of cases suggesting that a victim's consent is a defense in section 288, subdivision (b) cases.  This argument is irrelevant to defendant's appeal because he never raised consent as a defense.  Sufficient evidence other than Doe's lack of consent supported the jury's finding that defendant accomplished at least seven lewd or lascivious acts (including the hair pulling incident) by use of force.

16

distinguishable, separate punishment was allowed and we therefore find no error.  (*Scott, supra,* 9 Cal.4th at p. 344, fn. 6.)

## III.    DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.